**STATE of Missouri, Respondent,**

v.

**Jermane CLARK, Appellant.**

**No. SC 92003.**

Supreme Court of Missouri,
En Banc.

May 1, 2012.

Jessica M. Hathaway, Public Defender's Office, St. Louis, for Clark.

Robert J. (Jeff) Bartholomew, Attorney General's Office, Jefferson City, for State.

WILLIAM RAY PRICE, JR., Judge.

## I. Introduction

In April 2010, Jermane Clark was convicted of first degree murder and armed criminal action in connection with the death of Morris Thompson. The prosecution's case against Clark depended principally on the testimony of two witnesses. First, Glenn Shelby claimed to have given the murder weapon to Clark. Second, Maurice Payne claimed to have been an eyewitness to the murder.

Previously, Payne had pleaded guilty to unrelated charges before the same judge who presided over Clark's murder trial. Payne's decision to testify in Clark's case was not motivated by a plea agreement in his own case, and it was unlikely that his decision to testify against Clark would affect Payne's sentence favorably. Payne admitted that he subjectively hoped that his testimony against Clark would affect his sentence favorably, however. Clark's attorney was not permitted to question Payne concerning this potential bias.

The judgment of the circuit court is reversed and the case is remanded.

## II. Facts and Procedural History

### A. The Initial Investigation

On December 28, 2008, Officer Damon Willis of the St. Louis Metropolitan Police Department was called to the 4300 block of Lee Avenue. There, behind a vacant four-family flat, Officer Willis found the dead body of Morris Thompson face-down in a grassy area. A bullet found inside Thompson's leather jacket was determined to be the cause of death.

Two days later, Officer Willis again was called to the 4300 block of Lee Avenue, this time on a report of a suspicious person named "Glenn" who was displaying a handgun. When Officer Willis arrived at the scene, a man matching the description of the suspicious person took off running, and Officer Willis gave chase on foot. Officer Willis eventually caught and arrested the fleeing man, Glenn Shelby. Immediately after Officer Willis arrested him, Shelby showed Officer Willis where he had hidden a gun in a nearby trash dumpster. Shelby was released shortly after this arrest.

Firearms specialists concluded that Shelby's gun was the weapon used to kill Thompson. Homicide detectives immediately began searching for Shelby but did not arrest him until January 20. Under interrogation, Shelby told detectives that, shortly before Thompson's death, he had given the murder weapon to Jermane Clark. Shelby also claimed that Clark had admitted to killing Thompson. Shelby told detectives that another man, Maurice Payne, also had been in the area of the murder shortly before Thompson was killed.

The police questioned Payne on January 22. Payne claimed that he had watched as Clark shot Thompson to death. Based on Shelby's and Payne's accounts, Clark was charged with first degree murder, first degree robbery and two counts of armed criminal action. After learning of the charges, Clark voluntarily surrendered to the police on January 23.

## B. Shelby's Testimony

At trial, Shelby testified that on the day of the murder he was "hanging around" with Payne and Clark in front of 4338 Lee Avenue. Thompson approached them and asked to buy crack cocaine. According to Shelby's testimony, Clark then asked Shelby if he could sell Thompson some fake crack cocaine. Shelby told Clark to do whatever he liked, gave Clark his gun and left.

Shelby testified that, a few minutes later, while he was walking to the market with his sisters, he heard a gun shot. He continued walking to the market, and after visiting the market, he went to his grandmother's house.

Shelby testified that he later saw Clark in an alley as Clark was running toward Newstead Avenue. According to Shelby's testimony, Clark told Shelby that he had tried to sell Thompson fake crack cocaine, but that Thompson was not falling for it, so Clark decided to rob Thompson instead. Shelby testified that Clark told him he had stolen Thompson's mobile phone [1] and then shot Thompson.

## C. Payne's Testimony

At trial, Payne testified that on the day of the murder he was with Shelby and Clark in the 4300 block of Lee Avenue. Thompson approached them and asked to buy crack cocaine. Payne told Thompson that he should go into the backyard of a nearby vacant house. Payne also went to

---

1. Detectives were unable to recover Thompson's mobile phone. They did, however, obtain records showing the numbers that had been called from the mobile phone after Thompson's death. Approximately 50 calls were made, but detectives found no connection between any of them and Clark.

the backyard and sold Thompson three rocks of crack cocaine for $30. Payne testified that Clark then pulled a gun and demanded Thompson's money. Thompson tried to run, and Clark shot Thompson. Clark then approached the body and searched the pockets. According to Payne, Shelby appeared immediately after the killing and asked what had happened, and Payne told him that Clark had killed Thompson.

Prior to Payne's testimony, Clark's attorney notified both the judge and the circuit attorney that he planned to elicit testimony that Payne hoped to receive favorable treatment during the sentencing phase of his own criminal proceeding in return for testifying at Clark's trial. Payne had been charged with second degree burglary and theft in a case that was unrelated to Thompson's murder. The judge sitting in Clark's murder trial also had sat in Payne's burglary trial, and Payne had pleaded guilty about four weeks earlier. Payne was eligible for a sentence of up to 16 years' imprisonment, but in lieu of sentencing, Payne's case had been transferred to the City of St. Louis drug courts. Participation in a drug court program is conditional on completing drug court requirements and following drug court rules. Failure to comply with these requirements would result in retransfer of Payne's case to the circuit court for traditional sentencing. After Payne's guilty plea but before Clark's trial, Clark's attorney deposed Payne. During the deposition, Payne indicated that he hoped his testimony against Clark might earn him leniency should he fail the drug court program.

The circuit attorney agreed that Clark was permitted to cross-examine Payne concerning Payne's guilty plea. But she argued that Clark could not cross-examine Payne about Payne's hope for leniency. The circuit attorney argued that Clark could not attempt to portray Payne as "dishonest simply based on his desires" for leniency. The circuit attorney also argued that, because it was uncertain whether Payne would ever face traditional sentencing, whatever hope Payne might have entertained was too tenuous to form a basis for impeachment. Because Payne might never face sentencing, his hopes were irrelevant, and allowing questioning on the subject would be more prejudicial than probative.

In response, Clark argued that prohibiting this avenue of cross-examination was a violation of his constitutional right to due process and a violation of the Sixth Amendment's Confrontation Clause.[2] The judge sustained the circuit attorney's objection, noting that Payne had not even been offered a plea deal in exchange for his testimony in Clark's case. The judge allowed Clark's attorney to submit an offer of proof, during which he asked Payne about his subjective hopes. The offer of proof demonstrated that Payne would have testified that he hoped for leniency in a possible future sentencing as a result of his testimony against Clark.

### D. Clark's Conviction and Appeal

The State called 12 witnesses to testify against Clark, including Officer Willis, St. Louis Metropolitan Police Department homicide detectives, Shelby and Payne. The State did not present any physical evidence tying Clark to Thompson's murder. Clark did not call any witnesses.

The jury convicted Clark of first degree murder and armed criminal action, and the circuit court sentenced Clark to two concurrent terms of life imprisonment. Clark

2. "[I]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI, cl. 2.

timely filed a motion for a new trial in which he alleged that the circuit court had abused its discretion by preventing Clark from cross-examining Payne on the issue of Payne's hope for leniency. The circuit court overruled Clark's motion.

Clark appeals his conviction.

## III. Standard of Review

■ "The trial court has broad discretion over the extent of cross-examination, especially in criminal cases." *State v. Gardner*, 8 S.W.3d 66, 72 (Mo. banc 1999). "[C]ross-examination may not encompass incompetent, irrelevant, or immaterial matters.... However, questions of relevancy are for the trial court, whose ruling will be disturbed only for abuse of discretion." *Id.* An abuse of discretion occurs "when a ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." *State v. Gonzales*, 153 S.W.3d 311, 312 (Mo. banc 2005). This Court reviews a trial court's decision to admit or exclude evidence "for prejudice, not mere error.... Trial court error is prejudicial if there is a reasonable probability that the court's error affected the outcome of the trial." *State v. Winfrey*, 337 S.W.3d 1, 5 (Mo. banc 2011) (internal quotations and citations omitted).

■ "[W]hether a criminal defendant's rights were violated under the Confrontation Clause ... is a question of law that this Court reviews *de novo*." *State v. March*, 216 S.W.3d 663, 664–65 (Mo. banc 2007). Such questions are subject to a harmless error test, which means that a conviction must be overturned unless "the error be harmless beyond a reasonable doubt...." *Id.* at 667.

## IV. Analysis

■ Clark argues that the circuit court's failure to allow cross-examination of Payne on his hope for leniency violated his constitutional rights. But there is no need to resort to constitutional analysis. Under Missouri's law of evidence, the circuit court's decision to prohibit this cross-examination was an abuse of discretion. "It has long been the rule in Missouri that on cross-examination a witness may be asked any questions to test his accuracy, veracity or credibility." *Mitchell v. Kardesch*, 313 S.W.3d 667, 670 (Mo. banc 2010). "It is well-established that the interest of a witness is never irrelevant.... Consequently, cross-examination ... is permissible if it shows the bias or interest because a witness's bias or interest could affect the reliability of the witness's testimony on any issue.... Although the trial court has discretion in limiting the scope and extent of cross-examination bearing on the witness's bias or interest, the court cannot bar cross-examination into that subject completely." *Winfrey*, 337 S.W.3d at 8 (internal quotations and citations omitted).

Here, Payne admitted during Clark's offer of proof that, in the event that his own case was retransferred to the circuit court for sentencing, he hoped he would reap a benefit because he had testified against Clark. A reasonable jury could have concluded that Payne's subjective hope was a source of bias. Because a witness's potential bias is always relevant, Clark should have been allowed to cross-examine Payne on this issue.

As a rationale for its decision to exclude this evidence, the circuit court relied heavily on the fact that the State had never, in fact, offered Payne a plea deal. But this reasoning fails to account for the subjective nature of "bias." "The term 'bias' includes all varieties of hostility or prejudice against the opponent personally or of favor to the proponent personally.... Evidence showing bias includes circum-

stances of the witness's situation that make it probable that he or she has partiality of emotion for one party's cause." *State v. J.L.S.*, 259 S.W.3d 39, 44 (Mo.App. 2008) (internal quotations and citations omitted). It is possible for a witness to mistakenly perceive a fact and yet to be biased as a result of his or her mistaken perception. Payne's belief that his testimony would have a favorable effect on future sentencing may have been mistaken or speculative, but what is important is what he believed. A reasonable jury could have concluded that Payne's misplaced hope made him want to help the State.

 Clark was prejudiced by the circuit court's abuse of discretion. The State presented no physical evidence linking Clark to Thompson's murder. The State's case against Clark relied mainly on the testimony of Payne and Shelby. Shelby owned the gun used to kill Thompson, and a police officer recovered the gun from Shelby himself after he had arrested Shelby. Shelby failed to come forward with his information concerning Thompson's death before he was arrested. Thus, Shelby's testimony suffered from its own credibility problems. And Shelby's version of events diverges from Payne's version at key points, including whether Shelby arrived at the murder scene shortly after the murder and how Thompson, Payne and Clark came to be standing in the backyard.

Payne, too, failed to come forward with his information before detectives approached him, and Payne had pleaded guilty to burglary and theft just weeks before Clark's trial. Given these additional credibility problems, it is possible that the additional testimony that Clark would have elicited on cross-examination would have tipped the balance in the minds of the jurors and caused them not to believe Payne. Having made that judgment, jurors might have concluded that Shelby's

testimony alone, plagued by problems as it was, was insufficient to convict Clark beyond a reasonable doubt. There is a reasonable probability that the circuit court's decision to exclude the evidence affected the outcome of the trial. *See Winfrey*, 337 S.W.3d at 5.

## V. Conclusion

The circuit court abused its discretion by refusing Clark the opportunity to cross-examine a key witness on whether the witness was biased, and there is a reasonable probability that that error affected the outcome of the trial. Therefore the judgment of the circuit court is reversed and the case is remanded.

TEITELMAN, C.J., RUSSELL, BRECKENRIDGE, FISCHER and STITH, JJ., and MANNERS, Sp.J., concur.

DRAPER, J., not participating.